J-S18002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: X.Q.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 72 WDA 2025 |

Appeal from the Order Entered December 19, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  No. CP-02-AP-24-2024

BEFORE:   DUBOW, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED: August 4, 2025**

Appellant, B.M. ("Mother") appeals from the December 19, 2024 order entered in Allegheny County Court of Common Pleas that terminated her parental rights to three-year-old X.Q.M ("Child").[1]  Upon review, we affirm.

The Office of Children Youth and Families of Allegheny County ("the Agency") has been involved with Mother and her children since 2009.  Mother is diagnosed with a moderate intellectual disability.  She has a history of mental health issues, drug and alcohol abuse, intimate partner violence, and lack of consistent housing.  Mother has seven living children, none of which are in her care.  The trial court has involuntarily terminated her parental rights

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Child's father is C.D.M. ("Father").  On November 19, 2024, the trial court confirmed Father's consent to termination of parental rights.  Father is not a party to this appeal.

to two of the children, three of the children are in a subsidized permanent legal custodianship, and two are currently in foster care (including Child). An additional two children are deceased.

The Agency obtained emergency custody of Child at birth because Mother failed to obtain prenatal care throughout her pregnancy, had an open case with the Agency involving another one of her children, failed to comply with court-ordered services in the open case, and lacked stable housing. The Agency placed Child in a pre-adoptive foster home with J.E. ("Foster Mother") where he remains.

On May 31, 2022, the trial court adjudicated Child dependent and ordered Child to remain in foster care. At the time of adjudication, Mother's goals were to obtain services from the Office of Developmental Supports ("ODS"), engage in appropriate mental health services, address intimate partner violence ("IPV") issues, and obtain and maintain safe and appropriate housing. In February 2023, the court ordered Mother to participate in a drug and alcohol evaluation after concerns that Mother was intoxicated during a phone visit with another child.

The Agency referred Child for early intervention services through Alliance for Infants. The necessary services were delayed for three months due to Mother's refusal to sign consent forms. As a result, the trial court ordered the Agency to be the educational and medical decisionmaker for Child. Once the services were implemented via court order, Child benefitted greatly from physical, occupational, and speech therapy.

The Agency referred Mother to POWER[2] for a drug and alcohol evaluation but Mother failed to participate. Mother only participated in one drug and alcohol screen, despite the Agency's requests for more.

The Agency implemented services through the ODS, Achieva, NOVA[3], and Mon Yough to assist Mother with her court-ordered objectives. Mother began receiving services from ODS on April 2, 2023. The services were delayed due to Mother's refusal to obtain her school transcript. NOVA assisted Mother with obtaining appropriate housing, but she was not able to maintain it. Achieva caseworker Chantel Hernandez specializes in supporting parents with intellectual disabilities and, through her agency, was assisting Mother with parenting. Mother met with Ms. Hernandez five times but was eventually discharged from the program due to lack of participation. Mother failed to complete a parenting support program.

Mother completed IPV treatment prior to Child's birth but continued to experience IPV issues. Following Child's birth, the Agency referred Mother for additional treatment at the Women's Center and Shelter, but Mother failed to comply with the recommended IPV education and treatment. On April 9, 2024, the McKees Rocks Police were called for a domestic disturbance at Mother's home where an intimate partner had lit a bonfire in the toilet and assaulted Mother, including urinating on her.

---

[2] POWER is an acronym for Pennsylvania Organization for Women in Early Recovery.

[3] NOVA is an acronym for No Violence Alliance.

Mother inconsistently attends weekly supervised visits with Child. Between April 2022 and May 2023, Mother attended only four visits. From May 2023 until September 2024, Mother attended nine in-person visits and three virtual visits. Mother has failed to progress from supervised visitation with Child. Mother neglected to schedule any medical appointments for Child and attended only one medical appointment for Child, despite being informed of each medical appointment through a text or phone call.

On March 18, 2024, the Agency filed a petition to terminate Mother's parental rights. The trial court appointed Kids Voice to serve as Child's legal counsel and guardian *ad litem*, after finding that there was no conflict in Kids Voice serving in the dual role. On September 13, 2024, the trial court held a contested termination of parental rights hearing. The Agency presented testimony from Cassandra Guthrie[4], Agency caseworker; Police Officer David Finnerty; Chantel Hernandez, Achieva caseworker; Beth Bliss, Ph.D., who testified as expert in child and forensic psychology; Clare Chiaverini, Mon Yough Assistant Program Supervisor for foster care; Rhona Ray, Mon Yough caseworker. Mother testified on her own behalf.

The Agency's witnesses testified in accordance with the above-stated facts. In addition, Dr. Bliss explained that she had evaluated Mother on five separate occasions over the past ten years. Dr. Bliss testified that Mother has been diagnosed with a moderate intellectual disability and anger issues. Dr.

---

[4] Court documents refer to her as Cassandra Guthrie; the transcript incorrectly refers to her as Cassandra Duphrie.

Bliss further testified that Mother does not exhibit an understanding of why her children have been removed from her care. She explained that this lack of insight makes it hard for Mother to accept services or make any progress because she is unaware of what issues she is supposed to be addressing. Dr. Bliss further testified that Mother has not shown improvement over the past ten years. Dr. Bliss also explained that Mother fails to show an understanding of how intimate partner violence impacts her parenting and "greatly minimizes the context or the severity of the domestic violence and how it is impacting her life or her relationships." N.T. Hearing, 9/13/24, at 55.

Dr. Bliss testified that she observed interactions between Mother and Child. She explained that it was overall a "pretty positive interaction[.]" *Id.* at 57. Dr. Bliss stated that Child initially cried when he entered the room and tried to leave once, but Child was responsive to "imaginative play and they picked out appropriate toys." *Id.* at 58. Dr. Bliss explained that she did not observe signs of a "secure attachment" between Child and Mother and did not observe a "necessary and beneficial relationship." *Id.* Dr. Bliss further explained that if Mother's parental rights were terminated, it "would not cause [Child] undue trauma, that it is not a necessary relationship for him, for his psychological well-being." *Id.* at 76. In contrast, Dr. Bliss testified that Child does have a secure attachment with Foster Mother and removing Child from the foster home "could cause trauma" and be "extremely detrimental" to Child. *Id.* at 60, 80.

Dr. Bliss testified to her concerns regarding Mother's ability to parent Child, including the fact that, "despite working with Achieva, when I ask any of the parenting knowledge questions she really doesn't have the information necessary or knowledge about basic knowledge for care and shelter." *Id.* at 75. Dr. Bliss also expressed ongoing concerns about IPV and Mother's inability to protect herself or her children. Finally, Dr. Bliss testified that Mother has difficultly taking care of her own basic needs let alone taking care of Child's needs. Dr. Bliss testified that, in her professional opinion, she would recommend terminating Mother's parental rights.

Ms. Chiaverini explained that Child resides in a pre-adoptive foster home with Foster Mother, Foster Mother's mother, two adult sons, a 15-year-old daughter, and another 16-year- old foster child family." *Id.* at 95. She further testified that Child is very "bonded" and "close" to the entire family. *Id.* Ms. Chiaverini testified that Child receives physical, occupational, and speech therapy for developmental and vocal delays. Ms. Guthrie testified that Foster Mother is meeting all of Child's educational, psychological and developmental needs.

Mother testified that there was not a "real reasonable cause" why Child was removed from her care and the only reason she could think of was because her other children were in foster care. *Id.* at 182. When asked to explain some examples of parenting skills that she has learned from Achieva, Mother responded that "like she will have like a little paper and she will go to take what is on the paper and she will read it, and then she will ask me

questions about what to do – not what to do or not to do, but like empathy. Like I write the question, like my opinion on the question." *Id.* at 174. Mother testified that she is working with ODS over the phone because she cannot meet in person and explained that ODS is trying to assist her with housing. Mother testified that she found a support coordinator through The Hosana House and explained that they were helping her in meetings, meeting with her for dinner, and "they will do like activity with Disney and for like [Child] whenever I would see him and stuff like that." *Id.* at 176.

Mother testified that POWER came out to assess her drug and alcohol use after Child was born and gave her a urine sample and told her she was clean but did not give her any documentation. Mother testified that she did not receive any texts or phone calls to complete any additional drug and alcohol screens. Mother explained that alcohol has never been a problem for her "because if it was, the doctor would have said something." *Id.* at 183.

Mother testified that she has not completed IPV counseling since Child was born, that she did not consider the April 9, 2024 assault incident that required police intervention to be IPV, and that she has not experienced any other IPV incidents since Child was born. Mother testified that she tried to enroll in a coached parenting class on her own but that she is on a waiting list. Mother testified that she worked with various individuals from ODS and Achieva, but was unable to give an example of anything that she learned, stating "I don't know. . . I'm done. I can't think. I can't think right now." *Id.* at 182.

Mother testified that she plans to start school in the fall. She explained that she is anemic and sometimes her iron will be so low that she cannot get out of bed and attend visits. Mother explained that she initially refused to sign authorizations for Child to receive early intervention services because "I didn't think he needed it because he was so young and like I didn't see that because he was so young." *Id.* at 185. Mother stated that she has only been notified about one medical appointment where Child was supposed to have a procedure and she does not know the names of Child's doctors. Mother testified that she is capable of caring for Child and the only thing stopping her is appropriate housing. She testified that she was currently staying in "the Carolinas" but was trying to obtain appropriate housing in Pittsburgh. *Id.* at 201, 206. Mother explained that she is "trying to do better for myself, trying to find me a house, trying to find me a job, trying to go back to school." *Id.* at 188. When asked if she has friends or social groups that she uses for support, she explained that she watches church on YouTube every Sunday. Mother testified that the last time she visited with Child was during the evaluation with Dr. Bliss, which occurred in May 2024.

Mother testified that since she is doing virtual visits her relationship with Child "is not the same because I don't really get to see him as much as I should see him because my visits [are] like [every other month]." *Id.* at 190-91. Mother testified that Child does not have a name that he calls her, but that she calls him "Little Peewee." *Id.* at 191.

Mother testified that terminating her parental rights was not best for Child, that Child needs to maintain a relationship with her, and that Child "obviously needs to have me in his life." *Id.* at 193.

On December 19, 2024, the trial court terminated Mother's parental rights to Child.

Mother timely appealed. Mother and the trial court both complied with Pa.R.A.P 1925.

Mother raises the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2)?

2. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(5)?

3. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8)?

4. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Br. at 6.

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings

of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing

evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." ***In re Adoption of A.C.***, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." ***Id.*** (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." ***Id.*** (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. ***In re K.Z.S.***, 946 A.2d 753, 758 (Pa. Super. 2008).

With regards to Mother, we concentrate our analysis on Section 2511(a)(2). Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the

parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *see In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include "acts of refusal as well as incapacity to perform parental duties." *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010).

Finally, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *Id.* at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation omitted).

Mother avers that the Agency failed to provide sufficient evidence to terminate Mother's parental rights pursuant to Section 2511(a)(2). Mother's

Br. at 21. Mother argues that the record was devoid of evidence as to how her intellectual disability affected her capacity to parent. *Id.* Mother further argues that her visits with Child went well and did not present safety concerns, that the Agency failed to present sufficient evidence that Mother had ongoing drug and alcohol or IPV issues, and that Mother's visitation schedule never provided Mother with an ability to provide for Child's basic needs. *Id.* at 23. Mother's arguments are unavailing.

In its opinion, the trial court emphasized that the Agency has been involved with Mother for ten years, that Mother's seven living children have all been removed from her care, and that Mother still does not have insight into why her children have been removed from her care. Trial Ct. Op., 2/28/25, at 15. The trial court credited Dr. Bliss' expert testimony that Mother lacks insight into why her children keep being removed from her care and Dr. Bliss's opinion that Mother has not made any progress in ten years. The trial court opined:

> Throughout the proceedings in this case, it has become clear that Mother's intellectual disability, interposed with her drug and alcohol issues and mental health needs, as well as her continued intimate partner violence problems, remain insurmountable barriers to her ability to parent a child. These barriers have existed for at least a decade.
>
> Mother's history, when combined with her inability to make progress during the pendency of the instant case, paints a stark picture. She has no insight into why any of her children have been removed from her care, and as a result, has never been in a position to meaningfully address why removal occurred in this case. It bears repeating, Mother's lack of insight is so profound that she equated Dr. Bliss' statement that she interacted well with

- 13 -

the Child to an inability of this Court to terminate her rights: "[b]y her [Dr. Bliss] saying that my rights should be terminated but on the same token when I was there she said that I was interacting good with [Child], so how can they terminate it if I was like interacting with him and it wasn't making sense."

*Id.* at 14-15 (internal citations omitted). The trial court concluded, "[a]s to Section 2511(a)(2), Mother has repeatedly and consistently lacked the capacity to provide proper and essential parental care and control for her [c]hildren's wellbeing for at least ten years. Her history demonstrates that she cannot or will not remedy this incapacity." *Id.* at 16.

Our review of the record supports the trial court's findings, and we decline to usurp the trial court's credibility determinations or reweigh the evidence. Mother's own testimony is compelling. By her own admission, she has only had nine in-person visits with Child over a two-and-a-half-year period. At the time of the hearing, Mother was only having virtual visits with Child because of her choice to leave Pittsburgh and stay in "the Carolinas." Mother was unable to express anything that she has learned about parenting from the multiple agencies that have been assisting her and was unable to articulate the reasons why Child was not in her care. The record demonstrates that Mother has failed to fulfill her affirmative obligation to provide for the physical and emotional needs of Child on a consistent basis. Accordingly, we find no abuse of discretion in the trial court's conclusion that Mother does not have the capacity to provide proper and essential parental care and control for Child and she cannot or will not remedy this incapacity.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond" that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court may consider intangibles, "such as the love, comfort, security, and stability the child might have" with the adoptive resource. *N.A.M.*, 33 A.3d at 103. Ultimately, the concern is the needs and welfare of the child. *Z.P.*, 994 A.2d at 1121.

The trial court concluded that it was in Child's best interest to terminate Mother's parental rights under Section 2511(b). The trial court found that

Child does not have a beneficial bond with Mother and credited Dr. Bliss's testimony that Child would not experience undue trauma if Mother's parental rights were terminated. The court opined:

> The bond with Mother is not necessary nor beneficial to the Child. Maintaining the bond does not serve the Child's needs. The Child does not receive care or support in any fashion from Mother. She does not provide the stability of a home, safety, emotional support, or even the most basic care for the child such as food, education, medical care, toys, clothes, or entertainment.

Trial Ct. Op. at 19-20. The court further found that Child had a secure attachment to Foster Mother and his foster family. The court opined:

> In contrast to the failings of Mother, the Child has a positive and secure attachment with Foster Mother and others in the home. Dr. Bliss opined that if the Child were to be removed from Foster Mother's care, trauma would be caused to the Child. All of the Child's needs are met in the foster home. They feed, clothe, and provide for the Child's education. Child has benefited greatly from physical, occupational, and speech therapy while in the care of Foster Mother.

*Id.* (internal citations omitted).

The record supports the trial court's findings, and, thus, we discern no abuse of discretion. As always, we decline to reweigh the evidence or usurp the trial court's credibility findings.

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(a)(2) and (b). In

light of our disposition, we decline to address Mother's arguments as they relate to other subsections of Section 2511.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 08/04/2025